THOMAS STANDIDGE, APPELLANT, V. MAE CREVELING ET AL., APPELLEES.

6 N. W. (2d) 56

FILED OCTOBER 30, 1942. No. 31424.

*Charles R. Shopp* and *Meeker & Curtis*, for appellant.

*G. B. Hastings* and *Clyde Anderson, contra.*

Heard before SIMMONS, C. J., ROSE, EBERLY, PAINE, CARTER, MESSMORE and YEAGER, JJ.

MESSMORE, J.

Plaintiff seeks, in an equity action, to impress a constructive trust on real estate, in that a fiduciary relation existed between the plaintiff and defendants, and that the defendants, using plaintiff's money inequitably, purchased real estate, taking title thereto in their names. The trial court found for the defendants and dismissed the plaintiff's action. From this judgment plaintiff appeals.

The pleadings detail the factual situation, are sufficient in form to raise the issue involved and denial thereof, and in the interest of brevity will not be detailed in the opinion. The record discloses: Plaintiff, 95 years of age at the time

of the trial, and a resident of Imperial for 55 years, owned considerable property, among which were a residence, in which he lived alone, and another house, one vacant lot removed from his residence, where the defendants resided, for which they paid as rent $15 a month from July, 1934, to April, 1940. Defendant Mae Creveling, from and since the time she moved onto the plaintiff's premises, performed certain services for him. On occasions she mowed his lawn, did his washing and ironing, cleaned his house, swept the snow from his sidewalks, took him occasionally to the cemetery, where his wife, who had died about seven years previously, was buried; helped him to sow down the cemetery lot, and performed other small services and courtesies which need not be set out. She received small sums of money for some of these services. She assisted in the payment of his taxes, telephone and other bills, and on occasions made out checks for him. The record reflects two checks, totaling $25, received from him by her. It is not clear for what purpose the checks were given; she testified they were for services she had rendered and money she had loaned the plaintiff on occasional trips when she had taken him to Sterling and Holyoke, Colorado, and to North Platte and McCook, when convenient for him to go, and on these occasions she generally received money from him for gasoline and meals. They were trips on which he transacted some business. About six years previous to the trial, the plaintiff gave her some household furniture, on one occasion a piano, and on another supplied her with sufficient money to obtain for herself a wrist watch. These matters are detailed in the record, but we deem the foregoing sufficient.

The principal item is with reference to two checks, one in the amount of $775 and the other in the amount of $200. These checks had to do with what was known as the Bremer property which was to be sold at referee's sale, and was finally bought in by one of the Bremers. Defendant Mae Creveling negotiated a deal with the purchaser to buy the property for $2,500 and payment of some delinquent taxes, and costs, and made application for an F. H. A. loan in the

sum of $2,000. The balance owing constituted the amount of the two checks. When plaintiff was asked about the checks, he replied that he gave them to her and "that was all there was to it," and indicated, but not specifically, in his testimony that he expected to have the property for which the checks were given, and that defendants would rent it. Plaintiff's son, living in Chicago, called upon him periodically and was there on or about the 12th of April, 1940, which was plaintiff's birthday, and a conversation at that time between the son and defendant Mae Creveling appears in the record. We here set out the substance of these conversations for the reason that, if the plaintiff has established a cause of action for a trust, as pleaded, this evidence will be sufficient to either sustain or deny it.

The following is the testimony of defendant Mae Creveling as to the conversation of April 12, 1940 : "He (plaintiff) came to the door, knocked; I went to the door; he came into the kitchen. He says, 'What is this I hear about you purchasing the Bremer property?' I said, 'I haven't purchased it yet, but I did tell John Bremer if he bought it I would take it off of his hands.' Mr. Standidge said, 'In order to do that you have to have some money.' I said, 'Yes, I would.' He said, 'You didn't know this little house here—there has been a deed made out in escrow to you for three years;' and he said, 'Rather than have trouble from this deed, I have decided to give you the money you will need over and above your loan to buy this home.' Q. What did you say to that? A. Well, that surprised me. I had no idea of his intentions at all. I told him that would be fine and thanked him; told him I couldn't use no money because I had applied for no loan whatever and didn't know how much money I would need. * * * Q. Now, what, if anything else, did Mr. Standidge say about wanting to make you this gift? A. He said he had always been going to help me, give me something for what I had done for him; he wanted to see me get a start; he thought more of me than a lot of people, and he believed he would give me money then for what I had been doing for him." As to another conversation in plaintiff's home, wit-

ness was asked: "What, if anything, was said relative to his purchasing the Bremer property, if you recall? A. When I asked him if he would buy it and me rent it from him he said he was land and property poor; he didn't care for any more property at all. He said he wished it was his home that was selling, and he was sure of getting it sold." The witness testified as to a later conversation, June 28, 1940, in plaintiff's home, after the loan had been negotiated for the purchase of the property, as follows: "A. Yes; I told him that the loan had finally come and, well, we was going to complete the sale that day and I would need—he told me any time I needed the rest of the money—what the loan didn't cover—to come back. I told him I was ready for the rest of my money." This referred to the $775. She testified: "I told him the amount of money that was needed to be in the bank was seven hundred seventy-five dollars, and that was to be on deposit in order for me to get my loan; and he said he was going to help. I told him I was needing the money that day. He said he was going to give this to me." The check was made out that day and deposited in the Farmers & Merchants Bank in her name and remained there from June to November. Referring again to the conversation at the time the check was given, the witness testified: "Yes; he said he was a man of his word; he had wanted to help me, he was going to help me, and here was my money. He said he had been wanting to make a gift to me for the work I had been doing and the kindness I had shown him; he would rather see me get ahead than any one; he wanted to help me, gave me my check. * * * He said if this wasn't enough to come back and he would be glad to give me what more I was needing; in finishing up the sale any time more money was needed, to come to him, he would give it to me. * * * He says, 'Do you think this is going to be enough money?' I said, 'Enough for now until they go a little farther, see what more is needed;' he said he would be glad to help me then if I needed more."

Mrs. Creveling testified to another conversation on November 22, 1940, at the plaintiff's home. She stated that

she went into his home and "told him the loan had come and that I was needing two hundred dollars more to complete what I was to have on deposit to complete the sale; and that he had said he would help me; and he gave me two hundred dollars more to complete this and said he was glad that he could." In this connection the record reflects some conversations in that this defendant told the plaintiff that the second amount ($200) was to dig a sewer ditch, which was required by the Federal Housing Administration. She later explained that the sewer ditch was not dug; she had not obtained permission from the city, and the F. H. A. loan passed without this requirement. She further testified: "When he handed me this check, he said, 'I just wish that I could be alive when you get your loan paid off and could step into your home and see you in your home.' He says, 'I feel like you have got something to work for now.'" The $200 was likewise deposited in the Farmers & Merchants Bank.

Defendants moved to the Bremer property April 29, 1940, and continued to visit the plaintiff at his home two or three times a week from April to November. No demand was made on Mrs. Creveling by the plaintiff for a return of this money, or deed requested for the premises, and the only notice she claims to have had was the filing of this action. Her husband, who was standing in the doorway of the dining-room and about to proceed to his work at the time, corroborates her in testimony concerning the conversation of April 12, 1940. All of these conversations are detailed and are substantially alike on the cross-examination, with little variation.

Some contention is made with reference to plaintiff's son being out in the yard at the time of the conversation on or about April 12. This is denied by the son, inasmuch as he was en route from Chicago to Imperial at that time. The conversation, as testified by the son, was on the 20th of December, 1940, in the bedroom of his father's home. The son testified that he called Mrs. Creveling by telephone and told her that his father had asked that she come over. She

said she would come, and later called, stating that she had company, "and asked if it was important that she should. I told her that it was; so finally she came over. My father * * * was in the bedroom when I heard somebody coming. I walked to the dining-room. She came in, rushed past me, said nothing whatever to me; rushed in. I followed her into the bedroom. She rushed over, kissed my father. I said, 'Don't you kiss my father; he's my father, not yours.' I said, 'What would you do if a sister of mine'—." We give the substance of the rest of this conversation: The son demanded that Mrs. Creveling return the money or the deed to the father and stated that his father made the same request. Mrs. Creveling said he did not have any papers and she did not think he could do a thing about it. In testifying as to this conversation, Mrs. Creveling said she did make the remark that the plaintiff did not have any papers and that the money was a gift. The two versions of the conversation cannot be reconciled. The foregoing constitutes a résumé of the pertinent evidence.

The case is tried *de novo* in this court. A careful reading of the record is convincing that the plaintiff failed to prove the allegations of his petition by a preponderance of the evidence.

Cases cited and relied on by plaintiff are: *Stieber v. Vanderlip,* 136 Neb. 862, 287 N. W. 773, *Wixson v. Nebraska Conference Ass'n,* 122 Neb. 771, 241 N. W. 532, and other cases, presenting a much stronger state of facts, disclosing the confidence reposed in the person sought to be charged, and establishing a fiduciary relationship.

The plaintiff testified that he had no affection for this young married woman, 34 years of age and 60 years younger than himself. He said she hugged him a couple of times and kissed him oftener. He had confidence in her, he stated, to a certain extent; in fact, for his age he did a very good job of holding onto his property and attending to his business. True, there is evidence that he did not remember as well as he did formerly, especially so in the last year and a half or two years; but, had the defendant Mae Creveling

been a designing woman and had he placed full confidence in her, as disclosed by the facts in the cases cited by plaintiff, he would not still be owning 560 acres of land and town properties.

In weighing conflicting testimony in equity cases, this court will consider the fact that the trial judge observed the witnesses, their general demeanor while testifying, and reached a conclusion as to which testimony was the more credible. *Johnson v. Erickson*, 110 Neb. 511, 194 N. W. 670; *Ellingwood v. Schellberg*, 121 Neb. 207, 236 N. W. 451; *Eichholz v. Luikart*, 128 Neb. 368, 258 N. W. 869; *Cunningham v. Armour & Co.*, 133 Neb. 598, 276 N. W. 393; *Kennedy v. Buffalo County*, 134 Neb. 744, 279 N. W. 464; *Hild v. Hild*, 135 Neb. 896, 284 N. W. 730. The foregoing rule applies in the case at bar, and under the record we conclude that the judgment of the trial court is correct.

AFFIRMED.